# EXHIBIT A

Timothy J. Broking, Esq.
**Fox Rothschild LLP**
(Attorney No.: 000172005)
49 Market Street
Morristown, New Jersey 07960
Tel: 973-548-5055
tbroking@foxrothschild.com
*Attorneys for Plaintiff*

| | |
|---|---|
| SALIBA INVESTMENT, LLC d/b/a J&S MITSUBISHI<br><br>Plaintiff,<br><br>vs.<br><br>MITSUBISHI MOTORS NORTH AMERICA, INC<br><br>Defendant. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION, MERCER COUNTY DOCKET NO.: MER-L-<br><br>CIVIL ACTION<br><br>**COMPLAINT, JURY DEMAND, DEMAND FOR THE PRESERVATION OF DOCUMENTS, DESIGNATION OF TRIAL COUNSEL AND STAY OF FRANCHISE TERMINATION PURSUANT TO N.J.S.A. 56:10-30** |

Plaintiff Saliba Investment, LLC d/b/a J & S Mitsubishi ("Plaintiff"), by way of Complaint against Defendant, Mitsubishi Motors North America, Inc. ("Defendant") states as follows:

### INTRODUCTION

1.    This is an action for violations of the New Jersey Franchise Practices Act, specifically under N.J.S.A. § 56:10-5 for terminating Plaintiff's franchise without good cause, for a stay of the franchise termination under N.J.S.A. § 56:10-30, for violations of Plaintiff's common law rights by unlawfully terminating its franchise, and for damages relating to Defendant's conduct in connection with the franchise relationship between Plaintiff and Defendant.

### THE PARTIES

2.    Plaintiff is a limited liability company organized under the laws of the State of New Jersey which, at all times relevant to this action, has a principal place of business at 1721 N. Olden Ave., Ewing, New Jersey, which is located within Mercer County.

3.   At all times relevant to this action, Plaintiff is a franchised Mitsubishi motor vehicle dealer, having entered into a Mitsubishi Dealer Sales and Service Agreement dated January 16, 2024 ("Dealer Agreement").

4.   Defendant is a California corporation with a principal place of business and corporate headquarters located at 4031 Aspen Grove Drive, Suite 700, Franklin, Tennessee 37067.

## FACTS COMMON TO ALL COUNTS

5.   This action arises out of Defendant's wrongful conduct in violation of the Franchise Practices Act, N.J.S.A. § 56:10-1 et seq. (the "FPA"), and the Dealer's common law rights by unlawfully terminating Plaintiff's franchise.

6.   The FPA proscribes certain conduct by motor vehicle manufacturers and distributers (i.e., franchisors) as unlawful and as unfair business practices. In addition, the FPA supplements, rather than supplants, any and all common law rights that motor vehicle dealers may otherwise have, as shown by the language of the FPA and the unambiguous legislative intent behind the FPA.

7.   The FPA also prohibits the unlawful termination of franchises. N.J.S.A. § 56:10-5

8.   The FPA creates a private right of action for injunctive relief and damages and provides for the award of attorney fees:

> Any franchise may bring an action against its franchisor for violation of this act in the Superior Court of the State of New Jersey to recover damages sustained by reason of any violation of this act and, where appropriate, shall be entitled to injunctive relief. Such franchisee, if successful, shall also be entitled to the costs of the action including but not limited to reasonable attorney's fees.

9.   Under Section 56:10-30(a) of the FPA, the filing of this action automatically stays the termination of the Dealer's franchise pending the final disposition of this action.

10.   Defendant is the sole authorized distributor and manufacturer of new Mitsubishi motor vehicles and related parts and accessories in the United States, which it sells and distributes to its network of authorized Mitsubishi dealers pursuant to the terms of a Dealer Agreement.

11.   Plaintiff is a party to a Dealer Agreement with Defendant which authorizes it to sell and service Mitsubishi vehicles, among other things.

12.   Defendant establishes franchise relationships with authorized dealers throughout the United States so that the dealer network can provide retail sales and service to the public.

13.   Defendant wholesales Mitsubishi vehicles to the franchised dealers; in turn, the franchised dealers sell the vehicles at retail to the public and provide services for maintenance and repairs.

14.     Plaintiff is a "motor vehicle franchisee" as defined in N.J.S.A. § 56: 10-13 because it "has an established place of business" and is "actively engaged in the business of buying, selling or exchanging new motor vehicles and who has an established place of business." See also N.J.S.A. § 56:10-3 (d) and (f) (defining "place of business" and "franchisee").

15.     Defendant is a "motor vehicle franchisor" as defined in N.J.S.A. § 56:10-13 because it is "engaged in the business of manufacturing or assembling new motor vehicles, who will, under normal business conditions during the year, manufacture or assemble at least 10 new motor vehicles, and his motor vehicle distributors."

16.     On January 14, 2026, MMNA issued a Notice of Termination of the Dealer Agreement to Plaintiff, purporting to terminate the franchise relationship effective March 16, 2026, or sixty days from Dealer's receipt of the notice, whichever was later. The Notice of Termination cited multiple alleged grounds for termination, including Dealer's purported failure to complete Outlander Plug-In Hybrid Electric Vehicle ("PHEV") certification requirements, failure to maintain minimum inventory, and failure to comply with minimum staffing requirements. Attached hereto as **Exhibit A** is a copy of the Notice of Termination dated January 14, 2026.

17.     Remarkably and confusingly, the Notice of Termination erroneously invoked North Carolina law; specifically, N.C. Gen. Stat. § 20-305(6)(e), alleging that this termination arises from a termination "that includes fraud by a dealer owner." This reference is made despite the undisputed fact that Plaintiff's dealership is located in Ewing, New Jersey, and that the parties' relationship is governed by New Jersey law. This error calls into question the legitimacy and good faith of the entire termination process.

18.     Just seven days later, on January 21, 2026, MMNA issued a separate Notice of Material Breach to Plaintiff, citing Dealer's failure to meet sales performance standards and declining customer satisfaction indices, and affording Dealer a six-month period to cure those deficiencies. Attached hereto as **Exhibit B** is the Notice of Material Breach dated January 21, 2026. This Notice of Material Breach made no mention of the prior Notice of Termination, creating a fundamental contradiction: MMNA simultaneously sought to terminate the Dealer Agreement while also purporting to provide Dealer with a six-month cure period and an opportunity to improve performance.

19.     Plaintiff was actively working toward curing the alleged deficiencies identified by MMNA at the time the Notice of Termination was issued. On January 15, 2026, the day after receiving the Notice of Termination, Plaintiff issued a written email communication to MMNA that it had successfully completed the PHEV training, that the dealership was fully up to date on both sales and service requirements, that it would be submitting its allocation request for the PHEV models, and that all remaining staffing positions would be fully filled and enrolled in the system by January 23, 2026.

20.     MMNA seemingly proceeded with the termination notwithstanding Plaintiff's good-faith efforts to cure. On March 23, 2026, MMNA sent Plaintiff a letter setting forth Termination Repurchase Policy and Procedures, declaring that the Dealer Agreement had been terminated effective March 18, 2026, despite the fact that the most recent communication from

MMNA – specifically, the January 21, 2026, Notice of Material Breach – provided Plaintiff with a six-month period to cure such alleged breaches.

21.    Plaintiff brings this action to challenge MMNA's unlawful termination of the Dealer Agreement and to vindicate its rights under the New Jersey Franchise Practices Act, N.J. Stat. Ann. § 56:10-1 et seq., and other applicable law.

### The Dealer Agreement

22.    Plaintiff and MMNA are parties to a Mitsubishi Dealer Sales and Service Agreement (the "Dealer Agreement"), pursuant to which Plaintiff was authorized to operate as a dealer of Mitsubishi products at the Dealership Premises located at 1721 N. Olden Ave., Ewing, New Jersey.

23.    Under the Dealer Agreement, Plaintiff agreed, among other things, to stock, sell, and service all models and types of MMNA vehicles distributed in Plaintiff's Sales Locality, to employ qualified personnel, and to use best efforts to promote the sale and service of Mitsubishi vehicles, parts, and accessories.

### January 14, 2026 Notice of Termination

24.    On January 14, 2026, MMNA sent Plaintiff a Notice of Termination of the Dealer Agreement, citing three categories of alleged breaches as grounds for termination: (1) Plaintiff's purported failure to complete Outlander PHEV certification requirements; (2) Plaintiff's purported failure to maintain a minimum inventory of Outlander PHEV vehicles for sale to retail customers; and (3) Plaintiff's purported failure to comply with minimum staffing requirements in its service department. Notably, MMNA made no mention of sales performance or other customer satisfaction metrics.

25.    The Notice of Termination further stated that it served as formal notice of MMNA's intent to terminate the Dealer Agreement "in compliance with the requirements of N.J. Stat. Ann. § 56:10-5."

26.    Despite purporting to comply with New Jersey law, the Notice of Termination erroneously cited North Carolina law. Specifically, the Notice of Termination cites N.C. Gen. Stat. § 20-305(6)(e) as a basis for denying Plaintiff dealership facilities assistance, stating: "Because this termination arises from a termination that includes 'fraud by a dealer owner,' N.C. Gen. Stat. § 20-305(6)(e) expressly provides that MMNA is not obligated to pay dealership facilities assistance to Dealer." This reference to North Carolina law is obviously inapplicable to Plaintiff's dealership, which is located in New Jersey and governed by New Jersey law.

27.    Upon information and belief, the erroneous reference to North Carolina law reflects MMNA's use of a form termination letter template that was not properly tailored to Plaintiff's circumstances, raising serious questions about whether MMNA undertook any individualized evaluation of the purported grounds for termination of Plaintiff's Dealer Agreement or whether the termination was instead a predetermined outcome. This is especially important considering the fact

4

that Plaintiff received a separate Notice of Material Breach just seven days after receiving the Notice of Termination – the subsequent Notice of Material Breach made no reference to the Notice of Termination whatsoever.

28.    On January 15, 2026, just one day after receiving the Notice of Termination, Plaintiff communicated to MMNA that it had successfully completed the PHEV training and that the dealership was fully up to date on both sales and service requirements. Plaintiff further informed MMNA that it would be submitting its allocation request for the PHEV models.

29.    Plaintiff also informed MMNA that all remaining staffing positions would be fully filled and enrolled in the system by January 23, 2026, directly addressing the alleged staffing deficiency cited in the Notice of Termination.

30.    Despite Plaintiff's diligent and good-faith efforts to cure the alleged defaults, MMNA did not withdraw, modify, or stay the Notice of Termination.

### The Contradictory January 21, 2026 Notice of Material Breach

31.    On January 21, 2026, just seven days after issuing the Notice of Termination, MMNA sent Plaintiff a separate Notice of Material Breach of the Dealer Agreement. This notice cited entirely different grounds from the Notice of Termination, alleging that Plaintiff had failed to use "best efforts to promote, sell and service" Mitsubishi vehicles, parts, and accessories, as required under Section VII.A of the Standard Provisions.

32.    The Notice of Material Breach sets forth data regarding Plaintiff's sales performance, comparing actual sales to the Minimum Sales Responsibility ("MSR") benchmarks over multiple fiscal years, and also cited declining Reputation, SSI, and CSI scores. Importantly, this Notice of Material Breach relies upon data trends from 2022 and 2023; this dataset is an improper barometer for dealership performance. MMNA utilized year-over-year data trends without factoring in market conditions – the proper barometer for comparison of dealer performance would be to compare Plaintiff's data to that of other Mitsubishi dealers within similar markets.

33.    Critically, the Notice of Material Breach demanded that Plaintiff submit a written corrective action plan to its MMNA Regional Vice President within thirty days and stated that MMNA regional personnel would "work with [Plaintiff] over the next six months in an effort to improve the performance of [Plaintiff's] dealership." The notice further stated that "at the conclusion of this six-month period, MMNA will again evaluate Dealer's performance to determine whether Dealer has improved its performance and made significant progress toward achieving its MSR."

34.    The January 21, 2026, Notice of Material Breach made no reference whatsoever to the January 14, 2026 Notice of Termination. The simultaneous issuance of a termination notice and a separate notice affording a six-month cure period created an irreconcilable contradiction. On one hand, MMNA was terminating the Dealer Agreement within sixty days; on the other hand, MMNA was offering Plaintiff six months to cure separate performance deficiencies and committing to work collaboratively with Plaintiff during that period.

35.    This course of conduct is clearly contradictory - it evidences MMNA's bad faith, demonstrates the pretextual nature of the termination, and caused confusion regarding Plaintiff's rights and obligations, including its right to protest the termination under New Jersey law.

### Plaintiff's Failure to Protest

36.    Plaintiff did not file a protest or objection to the Notice of Termination within the time periods specified in the Notice of Termination or under N.J. Stat. Ann. § 56:10-5, largely because it believed that the subsequent Notice of Material Default superseded the Notice of Termination. Plaintiff's failure to protest was directly attributable to the confusion created by MMNA's contradictory course of conduct - simultaneously purporting to terminate the Dealer Agreement while also providing a six-month cure period under the separate Notice of Material Breach which was issued after the Notice of Termination - and to the erroneous legal references contained in the Notice of Termination.

37.    To the extent that MMNA's Notice of Termination failed to comply with the statutory requirements of the New Jersey Franchise Practices Act, including by referencing inapplicable North Carolina law, such notice was defective and did not trigger the protest deadlines under N.J. Stat. Ann. § 56:10-5.

### COUNT I
### (Violation of N.J.S.A. § 56:10-5 –Termination Without Good Cause)

38.    Plaintiff repeats and realleges each and every allegation set forth in ¶¶ 1 through 38 as if set forth at length herein.

39.    On or around January 14, 2026, Defendant served upon Plaintiff a Notice of Termination attached hereto as **Exhibit A**.

40.    It is a violation of N.J.S.A. § 56:10-5 to terminate a franchise without good cause.

41.    Defendant's termination of the Dealer Agreement was not supported by good cause within the meaning of New Jersey law. Plaintiff was actively curing the alleged defaults at the time the Notice of Termination was issued. Plaintiff had completed the PHEV training, was in the process of submitting its allocation request for PHEV models and was on track to have all remaining staffing positions filled within ten days.

42.    Defendant failed to provide Plaintiff with a reasonable opportunity to cure the alleged defaults before proceeding with termination, in violation of New Jersey law.

43.    Defendant's own contradictory conduct — simultaneously issuing a termination notice and a separate notice affording a six-month cure period — conclusively demonstrates that Defendant itself did not regard the purported grounds for termination as warranting immediate termination of the franchise relationship.

44.    As further evidence of Defendant's lack of good cause, within the Notice of Termination, Defendant relies on an August 18, 2023 staffing Notice of Default. This Notice was

6

issued nearly three years prior to the Notice of Termination. Reliance on this Notice as a ground for termination demonstrates a lack of good cause. Plaintiff cannot be held responsible for defaults that were previously remedies by the dealership.

45.     Similarly, Defendant's reliance on sales performance data from prior fiscal years to support the Notice of Material Breach further undermines any claim of good cause for termination as this data set does not consider current market conditions or the evolving landscape by which dealer's operate in.

46.     Defendant is further barred and estopped from asserting its basis for termination alleged in the Notice of Termination based on the doctrine of laches, equitable estoppel, and waiver.

47.     Under N.J.S.A. § 56:10-30(c), the Defendant has the burden of proving the termination does not violate N.J.S.A. § 56:10-5.

48.     Pursuant to N.J.S.A. § 56:10-30(a), upon the commencement of this action, the termination of the Dealers' franchise is automatically stayed, and Defendant shall accord the Plaintiff all rights and privileges of a franchisee as if the Notice of Termination had not been given. This includes the timely payment of incentives and warranty claims to the Plaintiff as they become due and owing.

49.     Pursuant to N.J.S.A. § 56:10-30(b), the Plaintiff is entitled to an injunction enjoining Defendant from terminating its franchise, and all other relief available under Section 56:10-10, including, without limitation, damages and attorneys' fees.

**WHEREFORE,** Plaintiffs demands judgment against Defendants, as follows:

    (a)    For actual damages;

    (b)    For compensatory damages;

    (c)    For consequential damages;

    (d)    For attorney's fees;

    (e)    Costs of suit;

    (f)    For prejudgment interest and post-judgment interest;

    (g)    For any other relief the Court deems just and proper; and

    (h)    Pursuant to N.J.S.A. § 56: 10-30(b), the Plaintiff is entitled to an injunction enjoining Defendant from terminating its franchise, and all other relief available under Section 56:10-10, including, without limitation, damages and attorneys' fees.

## COUNT II
### (Tortious Interference With Prospective Economic Advantage)

50.     Plaintiff repeats and realleges each and every allegation set forth in ¶1 through 49 as if set forth at length herein.

51.     At all relevant times throughout, Plaintiff had a reasonable expectation of economic benefit or advantage from the sales of its business.

52.     At all relevant times, Defendants knew of Plaintiff's expectancy of the economic benefit and advantage upon the sale of Plaintiff's business.

53.     Defendants, utilizing their position of influence, willfully and intentionally interfered with Plaintiff's expectancy of economic benefit and advantage.

54.     There exists a reasonable probability that but for the Defendants' wrongful interference that the Plaintiff would have realized the economic benefit or advantage.

55.     As a direct and proximate result of the Defendants' wrongful conduct, Plaintiff has sustained damages.

WHEREFORE, Plaintiff, demand judgment against Defendant, as follows:

(a)     For actual damages;

(b)     For compensatory damages;

(c)     For consequential damages;

(d)     For attorney's fees;

(e)     Cost of suit;

(f)     For prejudgment interest and post-judgment interest;

(g)     For any other relief the Court deems just and proper; and

(h)     Pursuant to N.J.S.A. § 56: 10-30(b), the Plaintiff is entitled to an injunction enjoining Defendant from terminating its franchise, and all other relief available under Section 56:10-10, including, without limitation, damages and attorneys' fees.

## COUNT III
### (Breach of the Covenant of Good Faith and Fair Dealing)

56.     Plaintiff repeats and realleges each and every allegation set forth in ¶1 through 55 as if set forth at length herein.

8

57.    As a result of the Defendant's bad faith conduct and wrongful acts as set forth above, Defendant has breached the covenant of good faith and fair dealing implied in all contracts, including the Mitsubishi Dealer Sales and Service Agreement.

58.    New Jersey law implies a covenant of good faith and fair dealing into all contracts, requiring performance and enforcement of the contract and duties therein to be executed in good faith.

59.    Because Defendant is the sole source of the Defendant products to Defendant dealers, and with its dealers investing substantial capital in their facilities, personnel and fixed assets, there exists a dramatic economic imbalance in the relationship between Defendant and its dealers.

60.    The New Jersey Legislature acknowledged this imbalance in the Legislative Findings and Declarations in the FPA. See N.J.S.A. § 56:10-7.2.

61.    In bad faith, Defendant has improperly attempted to terminate Plaintiff's franchise by:

>    (a)    Issuing a Notice of Termination while Plaintiff was actively curing the alleged defaults and without affording Plaintiff a reasonable opportunity to complete those cure efforts.
>    (b)    Issuing a Notice of Termination effective within sixty days and a separate Notice of Material Breach issued only week later, affording a six-month cure period, creating irreconcilable and contradictory obligations.
>    (c)    Citing inapplicable North Carolina law in the Notice of Termination thereby creating confusion regarding Plaintiff's rights and impugning Plaintiff's reputation.
>    (d)    Proceeding with termination and issuing repurchase procedures notwithstanding Plaintiff's demonstrated good-faith efforts to cure the alleged defaults.
>    (e)    Issuing a Notice of Termination predicated upon animus toward Plaintiff's principal arising from his social media presence and the success derived therefrom.
>    (f)    Citing sales performance data from prior fiscal years, without factoring in market conditions or comparisons to other similarly situated dealers, in the Notice of Material Breach to support claims against Plaintiff for performance deficiencies that predated Plaintiff's acquisition of the dealership.

62.    As a direct and proximate result of the Defendant's breaches, the Plaintiff has been damaged in an amount to be determined at trial.

WHEREFORE, Plaintiff, demands judgment against Defendant, as follows:

(a)    For actual damages;

(b)    For compensatory damages;

(c)    For consequential damages;

(d)    For attorney's fees;

(e)    Cost of suit;

(f)    For prejudgment interest and post-judgment interest;

(g)    For any other relief the Court deems just and proper; and

(h)    Pursuant to Section 56: 10-30(b), the Plaintiff is entitled to an injunction enjoining Defendant from terminating its franchise, and all other relief available under Section 56: 10-10, including, without limitation, damages and attorneys' fees.

## COUNT IV
### (Breach of Contract)

63.    Plaintiff repeats and realleges each and every allegation set forth in ¶1 through 62 as if set forth at length herein.

64.    The Dealer Agreement constitutes a valid and binding contract between Plaintiff and Defendant.

65.    Plaintiff performed its obligations under the Dealer Agreement and was actively curing any remaining deficiencies at the time of the Notice of Termination.

66.    Defendant breached the Dealer Agreement by terminating the franchise without providing Plaintiff a reasonable opportunity to cure as contemplated by the Standard Provisions and the Dealer Agreement, and by subsequently issuing a contradictory Notice of Material Breach that provided a six-month cure period which constitutes an implicit acknowledgment that immediate termination was not warranted.

67.    Defendant further breached the Dealer Agreement by proceeding with termination based on grounds that Plaintiff had substantially cured or was in the process of curing at the time of termination.

68.    Defendant also breached the Dealer Agreement by proceeding with the termination by relying on alleged performance deficiencies that are predicated on flawed data sets.

10

69.     Therefore, Plaintiff has suffered and will continue to suffer damages, including but not limited to loss of the franchise, loss of goodwill, lost profits, and other consequential damages.

**WHEREFORE**, Plaintiff, demand judgment against Defendant, as follows:

(a)     For actual damages;

(b)     For compensatory damages;

(c)     For consequential damages;

(d)     For attorney's fees;

(e)     Cost of suit;

(f)     For prejudgment interest and post-judgment interest;

(g)     For any other relief the Court deems just and proper; and Pursuant to Section 56:10-30(b), the Plaintiff is entitled to an injunction enjoining Defendant from terminating its franchise, and all other relief available under Section 56: 10-10, including, without limitation, damages and attorneys' fees.

## COUNT V
### (Negligent Misrepresentation)

70.     Plaintiff repeats and realleges each and every allegation set forth in ¶1 through 69 as if set forth at length herein

71.     Defendant has negligently conveyed incorrect statements to Plaintiff.

72.     Plaintiff justifiably relied upon same and incurred costs and damages as a result of Defendant's negligent incorrect statements.

**WHEREFORE,** Plaintiff, demand judgment against Defendant, as follows:

(a)     For actual damages;

(b)     For compensatory damages;

(c)     For consequential damages;

(d)     For attorney's fees;

(e)     Cost of suit;

11

(f)     For prejudgment interest and post-judgment interest;

(g)     For any other relief the Court deems just and proper; and

(h)     Pursuant to Section 56: 10-30(b), the Plaintiff is entitled to an injunction enjoining Defendant from terminate its franchise, and all other relief available under Section 56:10-10, including, without limitation, damages and attorneys fees.

## COUNT VI
### (Equitable Estoppel and Waiver)

73.     Plaintiff repeats and realleges each and every allegation set forth in ¶1 through 72 as if set forth at length herein

74.     By issuing the January 21, 2026, Notice of Material Breach, which afforded Plaintiff a six-month cure period and committed Defendant to working collaboratively with Plaintiff to improve dealership performance, Defendant made representations and created expectations that were fundamentally inconsistent with the prior issued January 14, 2026 Notice of Termination.

75.     Plaintiff justifiably and reasonably relied upon the January 21, 2026 Notice of Material Breach and its offer of a six-month cure period in determining its response to the termination proceedings, including with respect to Plaintiff's decision not to file a formal protest within the deadlines set forth in the Notice of Termination.

76.     Defendant's conduct of issuing simultaneous and contradictory notices should estop Defendant from enforcing the termination of the Dealer Agreement and from asserting that Plaintiff's failure to file a timely protest constitutes a waiver of its right to challenge the termination.

77.     Alternatively, MMNA's issuance of the January 21, 2026 Notice of Material Breach constituted an implied waiver of the termination set forth in the January 14, 2026 Notice of Termination, as the two notices are fundamentally irreconcilable and wholly inconsistent.

**WHEREFORE,** Plaintiff, demand judgment against Defendant, as follows:

(a)     For actual damages;

(b)     For compensatory damages;

(c)     For consequential damages;

(d)     For attorney's fees;

(e)     Cost of suit;

12

(f)     For prejudgment interest and post-judgment interest;

(g)     For any other relief the Court deems just and proper; and

(h)     Pursuant to Section 56: 10-30(b), the Plaintiff is entitled to an injunction enjoining Defendant from terminate its franchise, and all other relief available under Section 56:10-10, including, without limitation, damages and attorneys fees.

**COUNT VII**
**(Violation of the New Jersey Franchise Practices Act N.J.S.A. § 56:10-5– Defective Notice of Termination)**

78.     Plaintiff repeats and realleges each and every allegation set forth in ¶1 through 77 as if set forth at length herein

79.     Under N.J.S.A. § 56:10-5, a franchisor seeking to terminate a franchise must provide the franchisee with written notice setting forth all the reasons for such termination.

80.     The Notice of Termination issued by Defendant was defective in multiple respects, including but not limited to: (1) the Notice of Termination erroneously cited to North Carolina statutory law which renders the Notie defective and demonstrates a failure to comply with statutory notice requirements; and (2) the Notice of Termination preceded a Notice of Material Breach which failed to reference or otherwise address the Notice of Termination; thus, Plaintiff relied upon the deadlines imposed by the subsequent Notice of Material Breach and not the Notice of Termination.

81.     Because the Notice of Termination was defective and failed to comply with the requirements of N.J.S.A. § 56:10-5, the termination of the Dealer Agreement is void and unenforceable.

**WHEREFORE,** Plaintiff, demand judgment against Defendant, as follows:

(a)     For actual damages;

(b)     For compensatory damages;

(c)     For consequential damages;

(d)     For attorney's fees;

(e)     Cost of suit;

(f)     For prejudgment interest and post-judgment interest;

(g)     For any other relief the Court deems just and proper; and

13

(h)      Pursuant to Section 56: 10-30(b), the Plaintiff is entitled to an injunction enjoining Defendant from terminate its franchise, and all other relief available under Section 56:10-10, including, without limitation, damages and attorneys fees.

## COUNT VIII
## (Declaratory Judgment)

82.      Plaintiff repeats and realleges each and every allegation set forth in ¶1 through 81 as if set forth at length herein.

83.      An actual controversy exists between Plaintiff and Defendant regarding the validity and enforceability of the purported termination of the Dealer Agreement.

84.      Plaintiff seeks a declaratory judgment, pursuant to N.J.S.A. § 2A:16-50 to 62 declaring that: (1) Defendant's Notice of Termination dated January 14, 2026, was defective and failed to comply with the requirements of N.J.S.A. § 56:10-5; (2) Defendant's termination of the Dealer Agreement was without good cause within the meaning of the New Jersey Franchise Practices Act; (3) the termination of the Dealer Agreement is void and unenforceable; and (4) the Dealer Agreement remains in full force and effect.

**WHEREFORE,** Plaintiff, demand judgment against Defendant, as follows:

(a)      For actual damages;

(b)      For compensatory damages;

(c)      For consequential damages;

(d)      For attorney's fees;

(e)      Cost of suit;

(f)      For prejudgment interest and post-judgment interest;

(g)      For any other relief the Court deems just and proper; and

(h)      Pursuant to Section 56: 10-30(b), the Plaintiff is entitled to an injunction enjoining Defendant from terminate its franchise, and all other relief available under Section 56:10-10, including, without limitation, damages and attorneys fees.

14

## DEMAND FOR PRESERVATION OF EVIDENCE

All Defendants are hereby directed and demanded to preserve all physical and electronic information pertaining in any way to Plaintiff's cause of action and/or prayers for relief, to any defenses to same, and pertaining to any party, including but to limited to electronic data storage, digital images, computer images, searchable data, emails, memos, text messages, maintenance records and any other information and/or data, and/or documents which may be relevant to any claim or defense in this litigation.

Failure to do so will result in a separate claim for spoliation of evidence, and appropriate adverse inferences.

**FOX ROTHSCHILD LLP**
**49 Market Street**
**Morristown, New Jersey 07960**
**973-548-5055**
**973-992-9125 (Facsimile)**
*Attorneys for Plaintiff*

By:/s/ *Timothy J. Broking*

Timothy J. Broking
Attorney ID: 000172005

Dated: March 31, 2026

15

## JURY DEMAND

Plaintiff demands a trial by jury on all issues subject to trial.

FOX ROTHSCHILD LLP
49 Market Street
Morristown, New Jersey 07960
973-548-5055
973-992-9125 (Facsimile)
*Attorneys for Plaintiff*


By:/s/ *Timothy J. Broking*

Timothy J. Broking
Attorney ID: 000172005

Dated:  March 31, 2026

## <u>RESERVATION OF RIGHTS</u>

Plaintiff reserves the right to file such specific amendments and/or additional claims as are applicable hereinafter in this action and/or as the same are subsequently discovered and identified.

**FOX ROTHSCHILD LLP**
**49 Market Street**
**Morristown, New Jersey 07960**
**973-548-5055**
**973-992-9125 (Facsimile)**
*Attorneys for Plaintiff*

By:/s/ *Timothy J. Broking*

    Timothy J. Broking
    Attorney ID: 000172005

## CERTIFICATION

Pursuant to R. 4:5-1, it is hereby stated that the matter in controversy is not now the subject of any other action pending in any other court, or of pending arbitration proceedings, to the best of my knowledge and belief. Also, to the best of my belief, no other action or arbitration proceeding is contemplated. Further, other than the parties set forth in this pleading and previous pleadings, at the present time I know of no other parties that should be joined in the within action.

I hereby certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

**FOX ROTHSCHILD LLP**
**49 Market Street**
**Morristown, New Jersey 07960**
**973-548-5055**
**973-992-9125 (Facsimile)**
*Attorneys for Plaintiff*

By: /s/ *Timothy J. Broking*

    Timothy J. Broking
    Attorney ID: 000172005

Dated: March 31, 2026

# Exhibit A

Docusign Envelope ID: 890FAB32-304A-40E3-BDD6-B3B7649F103C



**MITSUBISHI
MOTORS**

MITSUBISHI MOTORS NORTH AMERICA, INC.
4031 Aspen Grove Dr., Suite 650
Franklin, TN 37067
www.mitsubishicars.com

January 14, 2026

**<u>VIA EMAIL AND CERTIFIED U.S. MAIL – RETURN RECEIPT REQUESTED</u>**

Mr. George Saliba, Dealer Principal
Saliba Investment, LLC d/b/a J & S Mitsubishi
1721 N. Olden Ave.
Ewing, NJ  08638
george@jsmitsubishi.com; gsaliba28@gmail.com

**Re:    Notice of Termination of Mitsubishi Dealer Sales and Service Agreement**

Dear Mr. Saliba:

Saliba Investment, LLC d/b/a J &S Mitsubishi ("Dealer") and Mitsubishi Motors North America, Inc. ("MMNA") are parties to a Mitsubishi Dealer Sales and Service Agreement dated January 16, 2024 (the "Dealer Agreement"), pursuant to which Dealer operates as an authorized dealer of Mitsubishi products at 1721 N. Olden Ave., Ewing, New Jersey ("Dealership Premises"). Under the terms of the Dealer Agreement, Dealer assumed certain obligations as a Mitsubishi dealer in exchange for the rights granted it under the Dealer Agreement, including the right to sell and service new Mitsubishi motor vehicles.

Dealer has failed to comply with the reasonable requirements of the Dealer Agreement and the Mitsubishi Dealer Sales and Service Agreement Standard Provisions incorporated by reference therein ("Standard Provisions") in a manner that constitutes multiple material breaches of the Dealer Agreement and provides good cause for termination of the Dealer Agreement under applicable New Jersey law.  This letter serves as MMNA's statutory notice of its intent to terminate the Dealer Agreement in compliance with the requirements of N.J. Stat. Ann. § 56:10-5.

**<u>Dealer's Failure to Complete Outlander PHEV Certification Requirements</u>**

Among the vehicles in MMNA's product offerings is the Outlander Plug-In Hybrid Electric Vehicle (PHEV).  MMNA has offered the Outlander PHEV for sale in the United States since 2013; this revolutionary product is an integral part of Mitsubishi's line-up.  Because of the unique features of the Outlander PHEV, MMNA requires dealers, before receiving these vehicles for resale and being eligible for reimbursement for performing warranty service on them, to comply with the certification requirements in the Mitsubishi Outlander PHEV Plug-In Hybrid Certification Program Overview. These include installation of a minimum of three Level 2 Electric Vehicle Supply Equipment (EVSE) chargers at the dealership; acquisition of special service tools and equipment; and completion of PHEV specialist training by dealership employees. This ensures the safety of dealership employees with respect to electrically-charged batteries and other equipment and ensures that dealers are able to deliver the premium customer experience associated with the Outlander PHEV model. Dealer expressly promised in the Addendum to the Dealer Agreement that it would comply with these certification requirements.

Despite repeated requests from MMNA, including a written Notice of Default sent by MMNA dated August 5, 2025, Dealer has refused to complete all of the Outlander PHEV certification training requirements required to sell Outlander PHEV model vehicles. Under Section VII.E.1 of the Standard Provisions, Dealer agreed "to require the attendance of all

Docusign Envelope ID: 3901AB32-304A-49E3-BDD0-D3B7049F109C

its sales personnel at any special course, meetings or training sessions offered for their benefit from time to time by MMNA," and likewise promised in Section VIII.C.1 of the Standard Provisions to require the attendance of its service personnel at training sessions provided by MMNA. Dealer further agreed under both provisions that repeated failure by Dealer's sales and service personnel to attend required training "shall constitute grounds for termination of this Agreement under Section X.B.2.(i) hereof."

Because Dealer has refused to complete the required training to sell the Outlander PHEV, it is not able to sell that vehicle to retail customers.  Under Section VII.A of the Mitsubishi Dealer Sales and Service Agreement Standard Provisions (the "Standard Provisions, Dealer agreed that "Dealer's fundamental obligation under this Agreement is to stock, *sell* and service *all models* and types of MMNA Vehicles distributed in the Sales Locality by MMNA." (Emphasis added).  To satisfy this obligation, Dealer promised in Section IV.G of the Standard Provisions that "it shall, at all times, maintain the minimum inventory of MMNA Vehicles *for immediate sale* as set forth in the Dealer Development Plan from time to time by MMNA after consultation with Dealer." (Emphasis added). The failure of Dealer to maintain the minimum inventory of Mitsubishi vehicles as required under Section IV.G of the Standard Provisions constitutes grounds for termination of the Dealer Agreement under Section X.B.2.(n) of the Standard Provisions.

MMNA makes the Outlander PHEV available for distribution in Dealer's Sales Locality, and Dealer's inability to sell the Outlander PHEV model vehicle based on its failure to complete training requirements constitutes multiple material breaches of the Dealer Agreement. On or about October 20, 2025, MMNA sent Dealer a second Notice of Default over this issue demanding that Dealer cure this material breach of the Dealer Agreement within 30 days so Dealer could sell Outlander PHEV model vehicles to meet the demand of customers in your Sales Locality.  MMNA also demanded that Dealer confirm in writing that it had cured this default and/or had a concrete plan to do so within a reasonable time. Dealer ignored MMNA's demands and refused to cure these material breaches of the Dealer Agreement.

### Dealers Failure to Comply with Minimum Staffing Requirements

Under Section IV.D of the Standard Provisions, Dealer agreed to "employ qualified personnel in such capacities and in such number as may be specified in the Dealer Development Plan or as otherwise required by MMNA." In its prior Dealer Development Plan, Dealer promised to employ at least one parts manager and one parts counterman. Separately, MMNA required Dealer to employ at least one service writer.  On or about August 18, 2023, MMNA sent a Notice of Default after discovering Dealer had not staffed its service operation with a parts manager, a parts counterman, and a service writer.  MMNA informed Dealer the failure to adequately staff its service department constituted a material breach of the Dealer Agreement and demanded Dealer cure such breach on or before September 15, 2023.

Despite having received notice and an opportunity to cure, Dealer continues to operate a short-staffed service department without an active parts manager or a service consultant to this day, as MMNA personnel have observed on numerous occasions since MMNA delivered its August 2023 Notice of Default.  Dealer's continued failure to comply with staffing requirements in its service department compromises Dealer's ability to provide customers with prompt, courteous, and efficient service, constitutes a material breach of Section IV.D of the Standard Provisions, and provides grounds for termination of the Dealer Agreement pursuant to Section X.B.3 of the Standard Provisions.

**Accordingly, based on Dealer's repeated failure to require personnel to attend and complete required training; Dealer's failure to maintain a minimum inventory of**

Docusign Envelope ID: 090TADD2-304A-43LD-DDD0-DJDT04JT103C

**Outlander PHEV vehicles for sale to retail customers; and Dealer's failure to comply with minimum staffing requirements in its service department, MMNA hereby gives notice of its intent to terminate the Dealer Agreement pursuant to Sections X.B.2.i, X.B.2.n, and X.B.3 of the Standard Provisions effective 5:00 p.m. Eastern Time on March 16, 2026 or 60 days from Dealer's receipt of this notice, whichever is later. This shall also serve as formal notice of MMNA's intent to terminate the Dealer Agreement in compliance with the requirements of N.J. Stat. Ann. § 56:10-5.**

### Termination Requirements

As of the effective date of termination, Dealer must refrain from the further distribution and sale of new Mitsubishi products; remove from its Dealership Premises and discontinue use of all signs, trademarks, or trade names of MMNA used by it in connection with the sale and distribution of Mitsubishi products; refrain from any further advertising or publicity referring to Mitsubishi products, "Mitsubishi Motors," or Mitsubishi Motors North America, Inc.; return to MMNA all advertising materials provided by MMNA to Dealer free of charge; and otherwise comply fully with all of the provisions of the Dealer Agreement regarding a dealer's duties upon termination. Termination of the Dealer Agreement also terminates any rights provided to Dealer under the Dealer Agreement to use MMNA trademarks and/or trade dress, including, without limitation, Dealer's MMNA signage at the Dealership Premises. Termination of the Dealer Agreement also terminates any Dealer Equipment Lease and/or Software License between Dealer and MMNA. Dealer will be advised in writing of its obligations under that license and the procedures for returning the software and/or equipment to MMNA.

Within 30 days from the effective date of termination, Dealer should deliver to MMNA a detailed inventory listing any items referred to in Sections X.G.(1)-(4) of the Standard Provisions to the Dealer Agreement, and requesting that MMNA fulfill any repurchase obligations that it may have thereunder or under any applicable state law and of which Dealer wishes to take advantage. Because this termination arises from a termination that includes "fraud by a dealer owner," N.C. Gen. Stat. § 20-305(6)(e) expressly provides that MMNA is not obligated to pay dealership facilities assistance to Dealer.

In the meantime, and until the effective date of termination, MMNA will continue to conduct business with Dealer according to the Dealer Agreement, and MMNA expects Dealer to fulfill its responsibilities and obligations under the Dealer Agreement. MMNA further reserves and does not waive its rights to raise any other breaches of the Dealer Agreement that may exist now or in the future, and to issue notices of breach and/or termination pertaining to any such breach. This letter, and the notices provided herein, shall not be construed as a waiver of any other rights MMNA may possess against Dealer under any applicable agreement or law.

Sincerely,

DocuSigned by:

*ken konieczka*
CFDBE097A0D44ED...
Ken Konieczka
Senior Vice President, Sales Operations
Mitsubishi Motors North America, Inc.

DocuSigned by:

*Katherine Knight*
D5BF1D14FD994FE...
Katherine Knight
Senior Vice President, Chief Administrative Officer
Mitsubishi Motors North America, Inc.

cc:    MMNA Legal Department (*via email*)
       Brandon L. Bigelow, Esq. (*via email, brandon.bigelow@nelsonmullins.com*)

# Exhibit B



**MITSUBISHI MOTORS NORTH AMERICA, INC.**
4031 Aspen Grove Dr., Suite 650
Franklin, TN 37067
www.mitsubishicars.com

January 21, 2026

**VIA EMAIL AND CERTIFIED U.S. MAIL – RETURN RECEIPT REQUESTED**

Mr. George Saliba, Dealer Principal
Saliba Investment, LLC d/b/a J & S Mitsubishi
1721 N. Olden Ave.
Ewing, NJ  08638
george@jsmitsubishi.com; gsaliba28@gmail.com

**Re:    Notice of Material Breach of Mitsubishi Dealer Sales and Service Agreement**

Dear Mr. Saliba:

Saliba Investment, LLC d/b/a J &S Mitsubishi ("Dealer") and Mitsubishi Motors North America, Inc. ("MMNA") are parties to a Mitsubishi Dealer Sales and Service Agreement dated January 16, 2024 (the "Dealer Agreement"), pursuant to which Dealer operates as an authorized dealer of Mitsubishi products at 1721 N. Olden Ave., Ewing, New Jersey ("Dealership Premises"). This letter gives notice of Dealer's ongoing material breach of the Dealer Agreement by failing to use "best efforts to promote, sell and service" Mitsubishi vehicles, parts, and accessories.

Under Section VII.A of the Mitsubishi Sales and Service Agreement Standard Provisions (the "Standard Provisions"), expressly incorporated by reference into the Dealer Agreement, Dealer promised to use "best efforts to promote, sell and service" Mitsubishi vehicles, parts, and accessories.  Dealer expressly agreed that it would "develop that sales volume necessary to meet Dealer's Minimum Sales Responsibility" or "MSR" as outlined in the Dealer Agreement and more particularly in the Dealer Development Plan ("DDP"). As set forth in your most recent DDP, MMNA has provided you a Notice of Primary Market Area ("PMA"), which defines the geographic area used by MMNA to evaluate Dealer's performance of its sales and service obligations under the Dealer Agreement. MMNA evaluates Dealer's sales performance by comparing your actual sales of new Mitsubishi vehicles, regardless of where those vehicles are registered, to the MSR for your dealership, which is effectively the sales expected for a Mitsubishi dealership in your PMA using the average market share of Mitsubishi dealers in the Census Division where your dealership is located as a benchmark.

Section VII.B.1 of the Standard Provisions provides for the periodic review of Dealer's performance based on the criteria set forth in the DDP, and requires MMNA to "note in writing any deficiencies it finds in Dealer's performance and operations." Set forth below is Dealer's fiscal year-end MSR for 2022 and 2023, together with fiscal year to date through November MSR for 2025, as compared to actual sales:

|  | FYE 2022 | FYE 2023 | FYTD 2025 (through 11/2025) |
|---|---|---|---|
| MSR | 244 | 227 | 89 |
| Actual Sales | 103 | 59 | 22 |
| % achieved | 42% | 26% | 25% |

Dealer's sales performance over the past three years shows a significant and alarming downward trend and suggests Dealer is not using "best efforts" to promote the sale and service of Mitsubishi vehicles, parts, and accessories. This downward trend is further reflected in Dealer's Reputation, Sales Satisfaction Index ("SSI"), and Customer Service Index ("CSI") scores—each of which are based on actual customer feedback from survey responses—over the past three years:

|  | Dec. 2023 | Dec. 2024 | Dec. 2025 |
|---|---|---|---|
| Reputation | 746 | 669 | 626 |
| SSI | 991 | 936 | N/A* |
| CSI | 978 | 974 | 973 |

* No survey responses submitted by customers during the period January-December 2025.

Again, these customer survey results—including the apparent refusal of every customer of Dealer who received a survey in connection with Dealer's SSI performance in 2025 to take the time to complete and submit a survey response—suggest Dealer is not using "best efforts" to promote the sale and service of Mitsubishi vehicles, parts, and accessories.

This letter constitutes written notice from MMNA that Dealer has failed to use "best efforts" to promote the sale and service of Mitsubishi vehicles, parts, and accessories, and must take all steps necessary to cure such default by improving its performance over the next six months and making significant progress toward achieving its MSR as required under the DDP.  In connection with such cure, MMNA demands you submit to your MMNA Regional Vice President within the next 30 days a written plan identifying how you intend to improve the performance of your dealership and otherwise improve your dealership's perception in the marketplace, and what resources you believe are necessary for you to achieve such improvement. MMNA regional personnel will review that written plan with you; provide suggestions, as appropriate; and will otherwise work with you over the next six months in an effort to improve the performance of your dealership.

At the conclusion of this six-month period, MMNA will again evaluate Dealer's performance to determine whether Dealer has improved its performance and made significant progress toward achieving its MSR. This Notice of Default shall not be construed as a waiver of any other rights MMNA has or may have under any applicable agreement or law, including, but not limited to, Section VII.B.1 and X.B.3.(a) of the Dealer Agreement. MMNA reserves all rights.

Regards,

Kimberly McKee
Director, National Dealer Development
Mitsubishi Motors North America, Inc.

cc:   Region Vice President (*each via email*)
      MMNA Legal Department
      Brandon L. Bigelow, Esq., Nelson Mullins Riley & Scarborough LLP

# Civil Case Information Statement

## Case Details: MERCER | Civil Part Docket# L-000715-26

**Case Caption:** SALIBA INVESTMENT, L LC  VS
MITSUBISHI MOTORS NO

**Case Initiation Date:** 03/31/2026

**Attorney Name:** TIMOTHY J BROKING

**Firm Name:** FOX ROTHSCHILD LLP

**Address:** 49 MARKET ST
MORRISTOWN NJ 079605122

**Phone:** 9739924800

**Name of Party:** PLAINTIFF : SALIBA INVESTMENT, LLC

**Name of Defendant's Primary Insurance Company**

**(if known):** Unknown

**Case Type:** OTHER Franchise Practices Act

**Document Type:** Complaint with Jury Demand

**Jury Demand:** YES - 6 JURORS

**Is this a professional malpractice case?** NO

**Related cases pending:** NO

**If yes, list docket numbers:**

**Do you anticipate adding any parties (arising out of same transaction or occurrence)?** NO

**Does this case involve claims related to COVID-19?** NO

**Are sexual abuse claims alleged by:** SALIBA INVESTMENT, LLC?
NO

## THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
### CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

**Do parties have a current, past, or recurrent relationship?** YES

**If yes, is that relationship:** Business

**Does the statute governing this case provide for payment of fees by the losing party?** YES

**Use this space to alert the court to any special case characteristics that may warrant individual management or accelerated disposition:**


**Do you or your client need any disability accommodations?** NO
**If yes, please identify the requested accommodation:**


**Will an interpreter be needed?** NO
**If yes, for what language:**


**Please check off each applicable category:** Putative Class Action? NO  Title 59? NO  Consumer Fraud? NO
**Medical Debt Claim?** NO


I certify that confidential personal identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

03/31/2026
Dated

/s/ TIMOTHY J BROKING
Signed