**FOX ROTHSCHILD LLP**
Timothy J. Broking, Esq. (000172005)
49 Market Street
Morristown, New Jersey 07960
Telephone: 973.992.4800
*Attorneys for Plaintiff and Counterclaim Defendant,*
*Saliba Investment LLC d/b/a J&S Mitsubishi*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| SALIBA INVESTMENT LLC d/b/a J&S MITSUBISHI,<br><br>      Plaintiff/Counterclaim-Defendant,<br><br>      v.<br><br>MITSUBISHI MOTORS NORTH AMERICA, INC.,<br><br>      Defendant/Counterclaim-Plaintiff. | Case Number 3:26-cv-05112-GC-TJB |

---

**MEMORANDUM OF LAW IN OPPOSITION TO MMNA'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND IN SUPPORT OF PLAINTIFF'S CROSS MOTION FOR INJUNCTIVE RELIEF**

---

185652864.3

# TABLE OF CONTENTS

**Pages**

I. PRELIMINARY STATEMENT ................................................................ 1

II. FACTUAL BACKGROUND................................................................... 2

    A.    MMNA And J&S Enter Into A Series Of Mitsubishi Dealer Sales And Service Agreements ................................................................... 2

    B.    MMNA Issues Notices Of Default................................................... 3

    C.    The January 14, 2026, Notice Of Termination................................ 3

    D.    J&S's Immediate Response And Cure Efforts ................................. 4

    E.    The Contradictory January 21, 2026 Notice Of Material Breach........................... 6

    F.    Jack Vossenberg Attempts to Facilitate A Competing Dealer's Effort To Purchase J&S's PHEV Inventory. ................................................. 7

III. LEGAL STANDARD ......................................................................... 8

    ARGUMENT........................................................................................ 10

    I.    MMNA'S MOTION SHOULD BE DENIED BECAUSE THE NOTICE OF TERMINATION WAS INEFFECTIVE AND THE DEALER AGREEMENT REMAINS IN FORCE. ................................. 10

        A.    The Notice Of Termination Failed To Comply With N.J.S.A. § 56:10-5 ........................................................................ 10

        B.    The January 21, 2026 Notice Of Material Breach Superseded The Notice Of Termination. ................................................... 12

    II.    MMNA IS ESTOPPED FROM ENFORCING THE NOTICE OF TERMINATION AND HAS WAIVED ITS RIGHT TO DO SO............. 13

        A.    Equitable Estoppel Bars MMNA From Relying On The Termination ......................................................................... 13

        B.    MMNA's Issuance Of The Notice Of Material Breach Constituted An Implied Waiver....................................................... 16

    III.    J&S IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS, AND ITS CROSS-MOTION FOR INJUNCTIVE RELIEF SHOULD BE GRANTED ........................................................................ 16

        A.    J&S Is Likely To Succeed On Its Claim That MMNA Terminated Without Good Cause .................................................. 16

    IV.    J&S WILL SUFFER IRREPARABLE HARM WITHOUT REINSTATEMENT ................................................................ 20

        A.    Loss Of A Franchise Constitutes Irreparable Harm Under New Jersey Law ................................................................... 20

i

B.    J&S Faces Specific and Concrete Irreparable Harms ................... 21

V.    MMNA SHOULD BE ENJOINED FROM ESTABLISHING A REPLACEMENT DEALER AT J&S'S BUSINESS LOCATION. .......... 23

VI.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR J&S'   23

A.    The Balance Of Equities Favors J&S .......................................... 23

B.    The Automatic Stay Under N.J.S.A. § 56:10-30(a) Supports J&S's Position ................................................................. 24

C.    The Public Interest Favors J&S .................................................. 25

CONCLUSION........................................................................................ 25

185652864.3

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Canal Auth. of State of Fla. v. Callaway*,
  489 F.2d 567 (5th Cir. 1974) ...........................................................................................10

*Hoelz v. Bowers*,
  473 N.J. Super. 42 (App. Div. 2022) ...............................................................................14

*Hoxworth v. Blinder, Robinson & Co.*,
  903 F.2d 186 (3d Cir. 1990)...............................................................................................8

*Knorr v. Smeal*,
  178 N.J. 169 (2003) ....................................................................................................14, 24

*Mattia v. Northern Ins. Co. of N.Y.*,
  35 N.J. Super. 503 (App. Div. 1955) ...............................................................................14

*New Jersey Hosp. Assoc. v. Waldman*,
  73 F.3d 509 (3d Cir.1995)...................................................................................................8

*Opticians Ass'n of Am. v. Indep. Opticians of Am.*,
  920 F.2d 187 (3d Cir. 1990)................................................................................................8

*Ortho Pharm. Corp. v. Amgen, Inc.*,
  882 F.2d 806 (3d Cir. 1989)................................................................................................9

*Reilly v. City of Harrisburg*,
  858 F.3d 173 (3d Cir. 2017)................................................................................................9

*Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*,
  212 F.3d 157 (3d Cir. 2000)..............................................................................................22

*Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*,
  60 F.3d 27 (2d Cir. 1995) ...................................................................................................9

*W.V. Pangborne & Co. v. N.J. Dep't of Transp.*,
  116 N.J. 543 (1989) ..........................................................................................................13

**Statutes**

FPA ..................................................................................................................... *passim*

*N.C. Gen. Stat.* § 20-305(6)(e)..............................................................................................3, 11

*N.J.S.A.* § 56:10-5 ................................................................................................ *passim*

*N.J.S.A.* § 56:10-7.2 ...................................................................................................25

*N.J.S.A.* § 56:10-16 to 35 ...........................................................................................16

*N.J.S.A.* § 56:10-30 ....................................................................................................16

*N.J.S.A.* § 56:10-30(a)...........................................................................................16, 24

*N.J.S.A.* § 56:10-30(b).................................................................................................20

*N.J.S.A.* § 56:10-30(c)....................................................................................4, 16, 17, 23

New Jersey Franchise Practices Act, *N.J.S.A.* § 56:10-1 *et seq.*.......................................1

**Other Authorities**

Fed. R. Civ. P.  65(a) ....................................................................................................8

185652864.3

## I.  PRELIMINARY STATEMENT

Plaintiff, Saliba Investment LLC d/b/a J&S Mitsubishi ("J&S"), respectfully submits this memorandum of law in opposition to the motion of Defendant, Mitsubishi Motors North America, Inc., ("MMNA") seeking a temporary restraining order and preliminary injunction, and in support of J&S's cross-motion for a preliminary injunction seeking reinstatement as an authorized Mitsubishi dealer and an order restraining MMNA from establishing a replacement dealer at J&S's business location during the pendency of this litigation.

This case presents a far more complex factual picture than MMNA's motion papers suggest. MMNA frames this case as a simple trademark dispute involving a "holdover licensee" who refuses to comply with post-termination obligations. In reality, MMNA's purported "termination" of J&S's Dealer Agreement was fundamentally defective under the New Jersey Franchise Practices Act ("FPA"), *N.J.S.A.* § 56:10-1 *et seq.*, and MMNA's own contradictory conduct demonstrates that the termination was pretextual, made in bad faith, and without good cause.

On January 14, 2026, MMNA issued a Notice of Termination ("Notice of Termination") to J&S that was riddled with errors, including an erroneous citation to North Carolina law despite J&S's dealership being located in New Jersey. The very next day, J&S contacted MMNA's Regional Vice President, Jack Vossenberg, ("Mr. Vossenberg") to advise that it had already cured the primary deficiency cited in the Notice of Termination — specifically, the PHEV training certification, so that J&S could receive into inventory and sell PHEV vehicles — and was actively remedying the remaining minor issues. Remarkably, on January 21, 2026, just seven days after the Notice of Termination, MMNA issued a separate Notice of Material Breach, citing entirely different grounds and affording J&S a six-month cure period; the January 21, 2026 Notice of Material Breach made no reference whatsoever to the Notice of Termination issued the previous week.

1

Newly discovered evidence further bears on MMNA's stated grounds for termination. On or about May 5, 2026, J&S's Dealer Principal, George Saliba ("Mr. Saliba"), received a text message from Bill Cimino, ("Mr. Cimino") the purported owner of a Mitsubishi dealership, Cornerstone Mitsubishi. Mr. Cimino stated that he obtained Mr. Saliba's phone number from "Jack" - i.e., Mr. Vossenberg, MMNA's Regional Vice President - and sought to purchase J&S's 2025 Outlander PHEV units. This communication demonstrates that MMNA, through its Regional Vice President, is aware that J&S maintained PHEV vehicles in its inventory and was therefore compliant with PHEV-related requirements, contrary to the principal basis for termination set forth in the Notice of Termination. It further reflects that MMNA knew any alleged deficiency as set forth within the Notice of Termination had been remedied, as its own executive facilitated contact aimed at arranging the transfer or sale of J&S's PHEV inventory to another MMNA dealer. At the same time, MMNA asks this Court for relief to enjoin and restrain J&S from operating as an MMNA dealer, including its ability to sell vehicles. That position is inconsistent with the conduct of its senior executive in attempting to arrange for J&S to sell its Outlander PHEV units, and it undermines MMNA's claim that such extraordinary relief is warranted.

For the reasons set forth below, this Court should deny MMNA's motion and grant J&S's cross-motion for injunctive relief.

## II.  FACTUAL BACKGROUND

### A.  MMNA And J&S Enter Into A Series Of Mitsubishi Dealer Sales And Service Agreements

Beginning on July 2016, MMNA and J&S entered into a series of Mitsubishi Dealer Sales and Service Agreements, each typically for a three-year term. *Certification of George Saliba* ("Saliba Cert.") at 3. On January 16, 2024, MMNA and J&S entered into the most recent Mitsubishi Dealer Sales and Service Agreement (the "Dealer Agreement"), which authorized J&S

2

185652864.3

to sell and service Mitsubishi vehicles, parts, and accessories from a location at 1721 North Olden Avenue, Ewing, New Jersey (the "Dealership Premises"). *Id.* Under the Dealer Agreement, J&S agreed to stock, sell, and service all models and types of MMNA vehicles distributed in J&S's Sales Locality, employ qualified personnel, and use best efforts to promote the sale and service of Mitsubishi vehicles.

J&S has invested substantial capital in its dealership facilities, personnel, equipment, and customer relationships to serve the Mitsubishi brand and the community in Ewing, New Jersey over the course of this nearly decade-long franchise relationship. *Id.* at ¶ 3

**B.      MMNA Issues Notices Of Default**

On August 5, 2025, MMNA issued J&S a written Notice of Default regarding J&S's failure to complete Outlander PHEV certification requirements, demanding cure within ninety days. On October 20, 2025, MMNA issued a second written Notice of Default regarding PHEV certification, inventory, and sales performance, demanding cure within thirty days. *Saliba Cert.*, ¶ 5.

**C.      The January 14, 2026, Notice Of Termination**

On January 14, 2026, MMNA sent J&S a Notice of Termination of the Dealer Agreement, ("Notice of Termination") purporting to terminate the franchise effective March 16, 2026, or sixty days from J&S's receipt of the notice, whichever was later. *Saliba Cert.*, ¶ 6. The Notice of Termination cited three grounds: (1) J&S's purported failure to complete Outlander PHEV certification requirements; (2) J&S's purported failure to maintain minimum inventory of Outlander PHEV vehicles for sale to retail customers; and (3) J&S's purported failure to comply with minimum staffing requirements in its service department. *See Saliba Cert.*, Exhibit A.

The Notice of Termination erroneously cited North Carolina law, specifically, *N.C. Gen. Stat.* § 20-305(6)(e), as a basis for denying J&S "dealership facilities assistance," stating: "Because this termination arises from a termination that includes 'fraud by a dealer owner,' N.C. Gen. Stat.

3

185652864.3

§ 20-305(6)(e) expressly provides that MMNA is not obligated to pay dealership facilities assistance to Dealer." *Id.* This citation to a North Carolina statute is obviously inapplicable to J&S's dealership, which is located in New Jersey and governed by New Jersey law. This error likely reflects MMNA's use of a boilerplate form termination letter template that was not properly tailored to J&S's circumstances, raising serious questions about whether MMNA undertook any individualized evaluation of the purported grounds for termination or whether the termination was instead a predetermined outcome. That this error appears in the Notice of Termination, the operative document by which MMNA is constrained to demonstrate "good cause," is particularly concerning. *See N.J.S.A.* § 56:10-30(c).

**D.      J&S's Immediate Response And Cure Efforts**

On January 15, 2026, just one day after receiving the Notice of Termination, Mr. Saliba, emailed Jack Vossenberg, MMNA's Regional Vice President for the North Region, ("Mr. Vossenberg") and provided the following update:

> "Hello Jack, I wanted to personally follow up and provide an update. We have successfully completed the PHEV training, and our dealership is now fully up to date on both sales and service requirements. Additionally, we will be submitting our allocation request for the PHEV models. Regarding staffing, all remaining positions will be fully filled and enrolled in the system by January 23rd. This item will be completed 100% by the end of next week . . . . We respectfully ask for the opportunity to move forward and demonstrate our commitment to the Mitsubishi brand."

4

185652864.3

*Saliba Cert.*, ¶¶ 7-10; *see also Saliba Cert.*, Exhibit B and below.

--------- Forwarded message ---------
From: **George Saliba** <gsaliba28@gmail.com>
Date: Thu, Jan 15, 2026 at 11:19 AM
Subject: Re: J&S Mitsubishi Notice of Termination 1/14/26 and J&S Mitsubishi MMNA NADA 2026
To: Vossenberg Frans <Frans.Vossenberg@na.mitsubishi-motors.com>
CC: GEORGE SALIBA MMNA-DP <george@jsmitsubishi.com>

Hello Jack,

I wanted to personally follow up and provide an update.

We have successfully completed the PHEV training, and our dealership is now fully up to date on both sales and service requirements. Additionally, we will be submitting our allocation request for the PHEV models.

Regarding staffing, all remaining positions will be fully filled and enrolled in the system by **January 23rd**. This item will be completed 100% by the end of next week.

We are also placing a stronger focus on creating content specifically for Mitsubishi customers. You will begin to see increased YouTube content rolling out shortly as part of this effort.

We do apologize for the delay in completing these items, and we appreciate your patience. We respectfully ask for the opportunity to move forward and demonstrate our commitment to the Mitsubishi brand.

Thank you for your continued support.

Best regards,
George Saliba

This email directly addressed each of the three grounds cited in the Notice of Termination and demonstrates that J&S was actively curing the alleged deficiencies within twenty-four hours of receiving the termination notice.

Notably, MMNA's own pleading, the Declaration of Frans Jack Vossenberg, submitted in support of MMNA's TRO motion, inaccurately and perhaps falsely states that "[a]t no time prior to or after [March 18, 2026] did the Dealer Principal of J&S, George Saliba, contact MMNA to advise that the deficiencies identified in the Notice of Termination and preceding Notices of Default had been cured or otherwise contact MMNA to address the deficiencies identified by MMNA in the Notice of Termination or the preceding Notices of Default." *See* Vossenberg Decl., ¶ 12. This statement is demonstrably false; the January 15, 2026, email sent directly to Mr. Vossenberg himself proves that J&S contacted MMNA the very next day. *Saliba Cert.*, ¶¶ 7-10; Ex. B. MMNA itself admitted in its Answer that "a J&S employee sent MMNA an email on January 15, 2026." *See* Answer and Counterclaims of Mitsubishi Motors North America, Inc., at ¶ 19.

Despite J&S's diligent and good-faith efforts to cure the alleged defaults, MMNA did not withdraw, modify, or stay the Notice of Termination.

5

E.        **The Contradictory January 21, 2026 Notice Of Material Breach**

On January 21, 2026, just seven days after the Notice of Termination, MMNA sent J&S a separate Notice of Material Breach of the Dealer Agreement ("Notice of Material Breach"). *Saliba Cert.*, ¶ 11; Ex. C. The Notice of Material Breach cited entirely different grounds of default from the Notice of Termination, alleging that J&S had failed to use "best efforts to promote, sell and service" Mitsubishi vehicles, parts, and accessories, and citing declining sales performance, customer satisfaction indices, and reputation scores. *Id.*

The Notice of Material Breach demanded that J&S submit a written corrective action plan to its MMNA Regional Vice President within thirty days and stated that "MMNA regional personnel will review that written plan with you; provide suggestions, as appropriate; and **will otherwise work with you over the next six months in an effort to improve the performance of your dealership**." *Id.* (emphasis added).  The notice further stated that "at the conclusion of this six-month period, MMNA will again evaluate Dealer's performance to determine whether Dealer has improved its performance and made significant progress toward achieving its MSR." *Saliba Cert.*, ¶¶ 7-10; Ex. B.

Critically, the Notice of Material Breach made absolutely no reference to the Notice of Termination. *Saliba Cert.*, ¶ 13; Ex. B. The simultaneous issuance of a termination notice and a separate notice affording a six-month cure period created an irreconcilable contradiction. On one hand, MMNA was terminating the Dealer Agreement within sixty days; on the other, MMNA was offering J&S six months to cure separate performance deficiencies and committing to work collaboratively with J&S during that period.

This course of conduct caused J&S to reasonably believe that the Notice of Material Breach, issued after the Notice of Termination, superseded and supplanted the termination. *Saliba*

6

*Cert.*, ¶¶ 15-16. It was this confusion, directly attributable to MMNA's contradictory conduct, that led J&S not to file a formal protest within the statutory deadlines. *Id.*

**F.    Jack Vossenberg Attempts to Facilitate A Competing Dealer's Effort To Purchase J&S's PHEV Inventory.**

On or about May 5, 2026, George Saliba received a text message from Bill Cimino, who identified himself as the owner of Cornerstone Mitsubishi. *Saliba Cert.*, ¶¶ 19-21; Ex. D. The text message stated:

> "George, this is Bill Cimino. I own Cornerstone Mitsubishi. I got your number from Jack. I wanted to know if you would be willing to sell some of your 2025 PHEV units you show in stock?"

*Saliba Cert.*, Ex. D, and below.



"Jack" seemingly refers to Jack Vossenberg, MMNA's Regional Vice President for the North Region; he is the MMNA executive who signed the Notices of Default, who received

185652864.3

Saliba's January 15 cure email, and who submitted the Declaration in support of MMNA's TRO motion. *Saliba Cert.*, ¶ 21

This evidence is devastating to MMNA's position for several reasons. First, it demonstrates that J&S did in fact obtain PHEV inventory - exactly as Mr. Saliba communicated it would on January 15, 2026. *Saliba Cert.*, ¶ 23. The Cimino message references J&S's "2025 PHEV units you show in stock," confirming that J&S cured the PHEV certification and inventory deficiency that was MMNA's primary ground for termination as set forth within the Notice of Termination. *Id.* Second, the fact that an MMNA executive provided a competing dealer with Mr. Saliba's phone number for the purpose of purchasing PHEV inventory, when MMNA's stated basis for termination was J&S's purported inability to sell PHEVs, demonstrates that MMNA's grounds for termination are pretextual. *Saliba Cert.*, ¶¶ 23-24. Third, Mr. Vossenberg's conduct in facilitating a competing dealership's effort to acquire J&S's inventory suggests that MMNA may be seeking to benefit a favored competing dealer at J&S's expense, further evidencing that the termination was not made in good faith or for good cause as required by *N.J.S.A.* § 56:10-5. *Saliba Cert.,* ¶ 25.

### III.  LEGAL STANDARD

Rule 65(a) of the Federal Rules of Civil Procedure authorizes federal courts to issue a preliminary injunction and Rule 65(b) authorizes federal courts to issue a temporary restraining order. When ruling on a motion for preliminary injunctive relief, a district court must consider four factors: (1) the likelihood that the applicant will prevail on the merits at final hearing; (2) the extent to which the applicant is being irreparably harmed by the conduct complained of; (3) the extent to which the non-moving party will suffer irreparable harm if the injunction is issued; and (4) whether the public interest favors the requested relief. *See Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 197-98 (3d Cir. 1990); *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 191-92 (3d Cir. 1990); *New Jersey Hosp. Assoc. v. Waldman*, 73 F.3d 509 (3d Cir.1995).

8

A party moving for preliminary equitable relief "must demonstrate that it can win on the merits (which requires a showing significantly better than negligible but not necessarily more likely than not) and that it is more likely than not to suffer irreparable harm in the absence of preliminary relief." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017).

Critically, MMNA's reliance on *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017) to support the position a "mandatory injunction" requires a heightened standard is misplaced. As an initial matter, the principle, as referenced within *Reilly v. City of Harrisburg*, that a mandatory injunction altering the status quo requires a heightened showing derives from *Tom Doherty Assocs., Inc. v. Saban Ent., Inc.*, 60 F.3d 27, 34 (2d Cir. 1995) - a Second Circuit decision without uniform adaptation in the Third Circuit.

In any event, J&S's cross-motion does not seek to "alter the status quo" in any meaningful sense; rather, it seeks to restore the status quo, i.e., the franchise relationship that existed for nearly a decade before MMNA's defective termination. The "status quo" for purposes of injunctive relief should not be defined by MMNA's unlawful conduct in purporting to terminate the Dealer Agreement, rather it is defined by the parties' longstanding contractual relationship.

Moreover, even where a preliminary injunction would alter current conditions, courts have recognized that such relief is appropriate, indeed necessary, where the existing state of affairs is itself causing irreparable harm. *See Ortho Pharm. Corp. v. Amgen, Inc.*, 882 F.2d 806, 813 (3d Cir. 1989). As the Fifth Circuit has explained in a passage widely cited by various courts:

> The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits. It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, *Ross-Whitney Corp. v. Smith Kline &*

9

185652864.3

> *French Laboratories*, 207 F.2d 190 (9th Cir. 1953), by the issuance of a mandatory injunction, *see* 7 Moore's Federal Practice [¶] 65.04(1), or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974).

Here, the current state of affairs in which J&S is being deprived of its franchise rights based on a defective and pretextual Notice of Termination, is itself causing J&S irreparable harm with each passing day. This Court therefore has ample authority to grant relief restoring J&S's dealership status regardless of whether such relief is characterized as "mandatory" or "status quo preserving."

## **ARGUMENT**

**I.      MMNA'S MOTION SHOULD BE DENIED BECAUSE THE NOTICE OF TERMINATION WAS INEFFECTIVE AND THE DEALER AGREEMENT REMAINS IN FORCE.**

MMNA's entire motion rests on a single premise: that the Dealer Agreement was properly terminated effective March 18, 2026, such that J&S's continued use of the Mitsubishi Marks constitutes unauthorized trademark infringement. But if the Notice of Termination was defective, as J&S contends and the evidence demonstrates, then the Dealer Agreement remains in full force and effect, and J&S retains its contractual right to use the Mitsubishi Marks as an authorized dealer. Under that scenario, J&S is not a "holdover licensee" engaging in unauthorized trademark use; it is a franchisee whose franchise was never properly terminated.

**A.      The Notice Of Termination Failed To Comply With N.J.S.A. § 56:10-5**

Under *N.J.S.A.* § 56:10-5, a franchisor seeking to terminate a franchise must provide the franchisee with written notice setting forth all the reasons for such termination. The notice requirements of the FPA are not mere formalities; they are substantive protections designed to

ensure that franchisees receive adequate notice of the grounds for termination so they may exercise their statutory rights, including the right to protest. *N.J.S.A.* § 56:10-5 further states that: "It shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause." As will be discussed in great detail herein, given that MMNA's Notice of Termination and asserted grounds for termination fall well below the threshold required to establish "good cause," it is confounding that MMNA continued to pursue termination even after being put on notice through Plaintiff's initial filing.

Additionally, the Notice of Termination erroneously cited *N.C. Gen. Stat.* § 20-305(6)(e), a North Carolina statute, as a basis for denying J&S dealership facilities assistance. *Saliba Cert.*, Ex. A. This is a provision that is wholly inapplicable to a New Jersey dealership governed by New Jersey law. While this citation might seem like a minor typographical error; it functioned as a substantive legal basis cited in the termination letter that bears directly on J&S's rights. The erroneous reference to North Carolina law raises serious questions about whether MMNA undertook any individualized evaluation of the purported grounds for termination of J&S's Dealer Agreement or whether the termination was instead a predetermined outcome applied mechanically without regard to J&S's actual circumstances.

Because the Notice of Termination failed to comply with the requirements of *N.J.S.A.* § 56:10-5, including by referencing inapplicable North Carolina law, such Notice was defective and did not trigger the protest deadlines under the statute. The Notice further fails to establish "good cause" for the termination; as such, the termination of the Dealer Agreement is therefore void and unenforceable.

11

185652864.3

**B.    The January 21, 2026 Notice Of Material Breach Superseded The Notice Of Termination.**

The January 21, 2026, Notice of Material Breach is fundamentally irreconcilably inconsistent with the January 14, 2026, Notice of Termination. It is entirely inconceivable that MMNA would issue a Notice of Material Breach a mere seven days after serving its Notice of Termination, and yet fail to include any reference to, or overlap with, the grounds asserted in the Notice of Termination. The complete disconnect between these two purportedly dispositive notices raises serious questions as to the coherence and reliability of MMNA's stated bases for termination – and the legal sufficiency of the Notices themselves.

The timing of the Notice of Termination and Notice of Material Breach is particularly significant given that, in the intervening period, Plaintiff proactively engaged with MMNA and advised that the vast majority of the issues identified in the Termination Notice had been remedied. *Saliba Cert.*, ¶¶ 6-10; Ex. B. Among other corrective actions as set forth within Mr. Saliba's email to Mr. Vossenberg, Plaintiff obtained PHEV certification and took concrete steps to secure and maintain inventory of PHEV vehicles—directly addressing the principal concern cited by MMNA. *Saliba Cert.*, ¶¶ 7; 23; Ex. D. These efforts were communicated to MMNA in good faith and within a timeframe that would reasonably warrant consideration. *Id.*

Under these circumstances, a reasonable party would have understood the subsequently issued Notice of Material Breach, raising entirely different issues, as supplanting or superseding the earlier Notice of Termination. Instead, MMNA's issuance of a second notice premised on wholly distinct grounds, without reconciling or even acknowledging the first, only compounds the ambiguity surrounding its position and further undermines the legitimacy of the termination process.

12

185652864.3

MMNA cannot simultaneously terminate the Dealer Agreement within sixty days while also offering J&S six months to cure separate performance deficiencies and committing to "work with" J&S during that period.

J&S reasonably understood the Notice of Material Breach—which was issued after the Notice of Termination—to supersede the termination. *Saliba Cert.*, ¶¶ 15-16. J&S's failure to file a formal protest within the statutory deadlines was directly attributable to this confusion. *Id.* To the extent MMNA argues that J&S waived its rights by failing to timely protest, that failure was the direct and proximate result of MMNA's own contradictory conduct, and MMNA should be estopped from relying on any such waiver defense.

## II.   MMNA IS ESTOPPED FROM ENFORCING THE NOTICE OF TERMINATION AND HAS WAIVED ITS RIGHT TO DO SO

### A.   Equitable Estoppel Bars MMNA From Relying On The Termination

By issuing the January 21, 2026 Notice of Material Breach—which afforded J&S a six-month cure period and committed MMNA to working collaboratively with J&S—MMNA made representations and created expectations that were fundamentally inconsistent with the prior Notice of Termination. J&S justifiably and reasonably relied upon the January 21, 2026 Notice of Material Breach and its offer of a six-month cure period in determining its response to the termination proceedings, including with respect to J&S's decision not to file a formal protest within the deadlines set forth in the Notice of Termination.

Equitable estoppel is "the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed…as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse." *W.V. Pangborne & Co. v. N.J. Dep't of Transp.*, 116 N.J. 543, 553 (1989) (quoting *Carlsen v. Masters, Mates & Pilots*

*Pension Plan Tr.*, 80 N.J. 334, 339 (1979)). Equitable estoppel "is applied only in very compelling circumstances…'where the interests of justice, morality and common fairness clearly dictate that course.'" *See Hoelz v. Bowers*, 473 N.J. Super. 42, 53 (App. Div. 2022) (citing *Davin, L.L.C. v. Daham*, 329 N.J. Super. 54, 67, 746 A.2d 1034 (App. Div. 2000) (quoting Palatine I v. Plan. Bd. of Montville, 133 N.J. 546, 560, 628 A.2d 321 (1993)).

Equitable estoppel "is designed to prevent injustice by not permitting a party to repudiate a course of action on which another party has relied to his detriment." *Knorr v. Smeal*, 178 N.J. 169 at 178 (2003); *Mattia v. Northern Ins. Co. of N.Y.*, 35 N.J. Super. 503, 510 (App. Div. 1955). In essence, MMNA is not permitted to take a position as it did in the Notice of Material Breach which was inconsistent with a prior position that it had asserted one week earlier in the Notice of Termination.

Equitable estoppel bars MMNA from relying on its Notice of Termination, which was issued just seven days before a subsequent Notice of Material Breach that conveyed a materially different and inconsistent position. This doctrine is designed to prevent injustice by prohibiting a party from repudiating a course of conduct upon which another has reasonably relied, to its detriment. Here, MMNA's own official communications created precisely that scenario. From the perspective of any reasonable dealer in Plaintiff's position, these formal, contradictory directives generated confusion and directly conflicting expectations. On one hand, the Notice of Termination declared that the dealership would be terminated within 60 days; on the other, the Notice of Material Breach—issued almost immediately thereafter—affirmatively represented that MMNA was committed to working collaboratively with Plaintiff and provided a six-month cure period to address alleged deficiencies. *Saliba Cert.*, Ex. A and C.

14

185652864.3

This inconsistency is particularly consequential given that Plaintiff promptly responded to the Notice of Termination, advising MMNA that the PHEV-related issues had been remedied and that any outstanding staffing concerns would be addressed within ten days. *Saliba Cert.*, ¶¶ 7-10; Ex. B. Armed with that knowledge, MMNA nevertheless issued a subsequent Notice of Material Breach offering an extended cure period and expressing a willingness to work with Plaintiff. Under these circumstances, Plaintiff reasonably relied on MMNA's later representations and course of conduct as controlling. Any reasonable dealer would have understood the six-month cure period, coupled with MMNA's expressed commitment to cooperation, as superseding the earlier termination directive.

At a minimum, if MMNA truly intended to proceed with termination in earnest, it was incumbent upon it to withdraw and reissue a clear and consistent Notice of Termination after providing Plaintiff the opportunity to cure. Having failed to do so, and instead deciding to issue conflicting official communications, MMNA cannot now disavow the expectations it created or benefit from Plaintiff's reasonable reliance, to its detriment.

These fundamentally inconsistent notices reasonably induced Plaintiff to rely on the later-issued Notice of Material Breach as controlling, particularly given its cooperative tone and extended opportunity to cure. It was entirely reasonable for Plaintiff to understand that MMNA had shifted its position away from immediate termination and toward remediation and continued operations.

Accordingly, MMNA should be estopped from now attempting to enforce or rely upon the earlier Notice of Termination. Plaintiff's reliance on the Notice of Material Breach, including its decision not to file a protest within the 60-day period, was a direct result of MMNA's inconsistent

15

185652864.3

and misleading communications, and equity does not permit MMNA to benefit from that inconsistency to Plaintiff's detriment.

**B.      MMNA's Issuance Of The Notice Of Material Breach Constituted An Implied Waiver**

Alternatively, MMNA's issuance of the January 21, 2026 Notice of Material Breach constituted an implied waiver of the Notice of Termination, as the two notices are fundamentally irreconcilable and wholly inconsistent. Under *N.J.S.A.* § 56:10-30(c), MMNA bears the burden of proving the termination does not violate *N.J.S.A.* § 56:10-5. MMNA cannot carry that burden where its own conduct demonstrates bad faith, pretext, and irreconcilable contradictions.

**III.    J&S IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS, AND ITS CROSS-MOTION FOR INJUNCTIVE RELIEF SHOULD BE GRANTED**

**A.      J&S Is Likely To Succeed On Its Claim That MMNA Terminated Without Good Cause**

Under *N.J.S.A.* § 56:10-5, it is a violation of the FPA to terminate a franchise without good cause. Specifically, the FPA states: "[i]t shall be a violation of this act for a franchisor to terminate, cancel or fail to renew a franchise without good cause. For the purposes of this act, good cause for terminating, canceling, or failing to renew a franchise shall be limited to failure by the franchisee to substantially comply with those requirements imposed upon him by the franchise." *Id.*

The FPA contains certain provisions that apply to motor vehicle franchisor/franchisee relationship directly. *See N.J.S.A.* § 56:10-16 to 35. *N.J.S.A.* § 56:10-30 further expands on the procedure for the termination of a franchise – in part, it provides that the "timely instruction of an action" to enjoin the termination of a franchise acts to automatically stay the termination "pending the final disposition of such an action or proceeding." *N.J.S.A.* § 56:10-30(a). During which time, the dealer is afforded "all rights and privileges of a franchisee as if notice of termination had not been given." *Id.*

16

185652864.3

Importantly, in any action "with respect to the termination of a motor vehicle franchise, the motor vehicle franchisor shall have the burden of proving that termination of the motor vehicle franchise does not violate section 5 of P.L.1971, c. 356 (C.56:10-5)." *N.J.S.A.* § 56:10-30(c). Furthermore, "in proving good cause for termination in any such action, the motor vehicle franchisor shall be limited to the grounds for termination set forth in the written notice provided for in section 5 of P.L.1971, c. 356 (C.56:10-5)." *Id.*

In light of this governing statutory framework, MMNA bears the burden of proving that its termination of the franchise was for "good cause," and, critically, it is strictly limited to the grounds expressly set forth in its written Notice of Termination. *N.J.S.A.* § 56:10-30(c). MMNA cannot rely on post hoc justifications or materials outside the Notice—including assertions such as those contained in Mr. Vossenberg's certification regarding vehicle sales performance—that were never identified as bases for termination.

Here, the Notice of Termination articulated two grounds for termination: (1) J&S's alleged failure to comply with Outlander PHEV certification requirements which prevented it from selling Outlander PHEV models; and (2) its alleged failure to hire and maintain certain personnel, including a parts manager, parts counterperson, and service writer. *Saliba Cert.*, 6; Ex. A. As set forth above, the first ground was fully remedied, as J&S obtained PHEV certification and successfully acquired and maintained PHEV inventory for sale. *Saliba Cert.*, ¶¶ 7-10; Ex. B. Accordingly, MMNA is in essence left to meet its statutory burden by demonstrating that the remaining personnel-related deficiencies alone constitute "good cause" for termination under the FPA - an exacting standard that cannot be supplemented or expanded beyond the limited grounds identified in the Notice itself.

MMNA is highly unlikely to prove "good cause" existed for the termination, thus J&S maintains a strong likelihood of success on the merits. First, at set forth at length herein, J&S was actively curing the alleged defaults at the time the Notice of Termination was issued. *Id*. By January 15, 2026—just one day after receiving the termination notice—J&S communicated to MMNA that it had completed the PHEV training, was in the process of submitting its allocation request for PHEV models, and was on track to have all remaining staffing positions filled within ten days. *Saliba Cert.*, ¶¶ 7-8; Ex. B. This was immediately and directly communicated to Mr. Vossenberg, despite him certifying otherwise. *Id;* Vossenberg Decl., ¶ 12.

Second, MMNA failed to provide J&S with a reasonable opportunity to cure the alleged defaults before proceeding with termination, in violation of New Jersey law and the principles underlying the FPA. This failure is particularly evident given that J&S promptly moved to address the issues identified in the Notice of Termination, yet MMNA appeared indifferent to those remedial efforts. *Saliba Cert.*, ¶¶ 7-8; Ex. B. Indeed, Mr. Saliba's email sent the very next day after receipt of the Notice, advising MMNA of corrective actions taken and underway, went entirely ignored by Mr. Vossenberg. *Id.* This lack of acknowledgment or engagement demonstrates that MMNA was not genuinely interested in affording J&S an opportunity to cure, but instead proceeded toward termination despite being apprised that the alleged deficiencies were being, or had been, remedied.

Third, MMNA's own contradictory conduct (i.e., simultaneously issuing a Notice of Termination and, just one week later, a separate Notice of Material Breach affording a six-month cure period) demonstrates that MMNA itself did not regard the purported grounds for termination as warranting the immediate termination of the franchise relationship. Rather, this sequence of events strongly suggests that MMNA either did not truly believe the grounds set forth in the Notice

18

of Termination were sufficient to justify termination, or perhaps that the Notice itself was issued prematurely or without appropriate deliberation. Whether MMNA inadvertently failed to withdraw the Notice of Termination or simply made a mistake, the precise explanation remains unclear. What is clear, however, is that MMNA cannot reconcile these fundamentally inconsistent positions. After declaring the franchise subject to termination within 60 days, MMNA then issued a subsequent formal communication committing to work with J&S and providing a six-month period to cure alleged deficiencies. MMNA cannot square that circle, and its conflicting actions undermine any claim that the asserted grounds justified termination in the first instance.

Fourth, MMNA's reliance on an August 18, 2023, staffing Notice of Default within the Notice of Termination, issued nearly three years before the Notice of Termination, further underscores the absence of good cause. *Saliba Cert.*, Ex. A.  In an apparent effort to justify its decision, MMNA attempts to resurrect a stale and previously addressed notice concerning alleged staffing deficiencies at the dealership. J&S cannot be held accountable, three years after the fact, for alleged defaults that were either remedied or that MMNA effectively acquiesced in over the course of several years without taking further action.

Moreover, the alleged failure to hire certain personnel does not rise to the level of conduct typically warranting termination under the FPA. This is not a case involving poor sales performance, fraud, misrepresentation, misconduct by the dealer, or any other act that might otherwise be construed as a material breach of the Dealer Agreement. Rather, staffing levels are inherently subject to a wide range of external factors beyond the dealer's control, including labor market conditions, economic uncertainty, and the availability of qualified candidates. To elevate such a variable issue into a basis for termination, particularly after years of inaction by MMNA,

19

185652864.3

betrays the lack of any good cause and highlights the arbitrary nature of MMNA's decision-making process.

Fifth, the newly discovered evidence concerning Mr. Vossenberg's facilitation of a competing dealer's effort to acquire J&S's PHEV inventory further undermines MMNA's asserted grounds for termination. *Saliba Cert.*, ¶¶ 19-25; Ex. D. As reflected in the Certification of Mr. Saliba, Mr. Vossenberg seemingly sought to arrange for J&S to sell its Outlander PHEV units to a Massachusetts dealer. *Id.* This conduct is wholly inconsistent with MMNA's claim that J&S was unable to receive or sell Outlander PHEV vehicles and directly calls into question the validity of that asserted basis for termination.

Indeed, Mr. Vossenberg's actions demonstrate not only that such inventory existed, but also that he is aware J&S had Outlander PHEV models in stock. The presence of that inventory necessarily presupposes that J&S satisfied the certification requirements identified in the Notice of Termination, as those certifications are a prerequisite to obtaining and maintaining PHEV vehicles. *Saliba Cert.*, ¶¶ 7-10; Ex. B. In other words, MMNA's own Regional Vice President appears to have acknowledged through his conduct that J&S had achieved compliance with the very requirement that MMNA later cited as a ground for termination, further eroding any claim that such a deficiency justified terminating the franchise.

## IV.    J&S WILL SUFFER IRREPARABLE HARM WITHOUT REINSTATEMENT

### A.    Loss Of A Franchise Constitutes Irreparable Harm Under New Jersey Law

The New Jersey FPA specifically provides for mandatory injunctive relief under *N.J.S.A.* § 56:10-30(b) upon the timely filing of a protest action, reflecting the New Jersey Legislature's recognition that termination of a franchise causes irreparable injury that cannot be adequately compensated by money damages. The loss of a franchise involves the destruction of an ongoing business relationship, the dissipation of goodwill built over years of operation, and the disruption

20

of customer relationships, none of which can be fully remedied after the fact. Furthermore, irreparable harm is plainly present because, during the pendency of this matter, nothing prevents MMNA from awarding the franchise to another dealer, and such harm cannot be remedied by money damages, since, even if J&S ultimately prevails, the placement of a new franchisee within its market area would effectively foreclose J&S's ability to reopen and operate in that same location.

**B.      J&S Faces Specific and Concrete Irreparable Harms**

If MMNA's TRO/preliminary injunction is granted and J&S is denied the ability to operate as an authorized Mitsubishi dealer, J&S will suffer irreparable harm including, but not limited to: (a) the loss of its franchise, which represents nearly a decade of investment in the Mitsubishi brand and the Ewing, New Jersey community; (b) the loss of customer goodwill and relationships that cannot be rebuilt; (c) the inability to service existing Mitsubishi customers or honor warranties, harming both J&S and the consuming public; and (d) the potential loss of its dealership territory to a replacement dealer, which would be impossible to reverse even if J&S ultimately prevails on its claims.

J&S will suffer immediate and irreparable harm absent injunctive relief, and those harms cannot be remedied by monetary damages. First, the loss of its Mitsubishi franchise would dismantle nearly a decade of investment in building the brand, goodwill, and reputation within the Ewing, New Jersey community, an investment that is both substantial and inherently non-recoverable. *Saliba Cert.*, ¶¶ 29-32. A dealership's identity is inextricably tied to its franchise, and once severed, that identity, and the goodwill associated with it, cannot simply be restored.

J&S faces the permanent loss of customer relationships and goodwill that it has cultivated over years of service. *Id.* Customer relationships are not fungible assets; they are built on trust, continuity, and brand affiliation. Once customers are forced to turn elsewhere for sales and service,

21

that trust is broken, and the resulting reputational harm cannot be quantified or repaired through damages. Relatedly, J&S will be unable to service existing Mitsubishi customers or honor warranties, disrupting ongoing relationships and harming both the dealership and the consuming public that relies on it.

Finally, and most critically, there is nothing preventing MMNA from awarding the franchise territory to a replacement dealer during the pendency of this action. If that occurs, J&S's injury becomes permanent. Even if J&S ultimately prevails on the merits, the installation of a new franchisee in its market area would foreclose any meaningful opportunity to resume operations in the same location. That loss of territory and market position is, by its nature, irreversible. Taken together, these harms establish a clear and compelling case of irreparable injury warranting immediate equitable relief.

MMNA may contend that irreparable harm is lacking because J&S did not immediately seek preliminary injunctive relief or because it allegedly failed to meet the statutory deadline to obtain an automatic stay. That argument is unavailing. Courts in the Third Circuit do not reflexively deny injunctive relief based on delay alone, particularly where the delay is reasonably explained. *See Times Mirror Magazines, Inc. v. Las Vegas Sports News, L.L.C.*, 212 F.3d 157, 169 (3d Cir. 2000) (rejecting the argument that a 15-month delay negated irreparable harm and recognizing that such delay was attributable to ongoing negotiations between the parties).

Here, any alleged delay is readily explained by J&S's good-faith efforts to resolve this dispute without court intervention. Upon filing its Complaint in State Court, and in light of the glaring deficiencies in the Notice of Termination and the weakness of MMNA's stated grounds, J&S reasonably attempted to negotiate with MMNA in an effort to reach a mutually agreeable

22

185652864.3

resolution. Those efforts should not be held against J&S, nor do they undermine the immediacy or irreparability of the harm it now faces.

**V.      MMNA SHOULD BE ENJOINED FROM ESTABLISHING A REPLACEMENT DEALER AT J&S'S BUSINESS LOCATION.**

Given J&S's strong likelihood of success on the merits, particularly in light of the defective Notice of Termination, MMNA's inconsistent and misleading course of conduct giving rise to equitable estoppel, and the absence of good cause supporting the grounds for termination, there is every reason for this Court to enjoin MMNA from awarding J&S's dealership territory or business location to another dealer during the pendency of this litigation.

Permitting MMNA to install a competing dealer at or near J&S's location at 1721 N. Olden Ave., Ewing, New Jersey would inflict irreparable harm that cannot be undone, even in the event of ultimate success on the merits. The introduction of a replacement dealer would permanently displace J&S from its market, sever its customer relationships, and eliminate any realistic opportunity to resume operations in that location. No monetary award could restore those losses or recreate the unique combination of location, goodwill, and market presence that J&S has built over many years. *Saliba Cert.*, ¶¶ 29-32.

**VI.     THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR J&S'**

**A.      The Balance Of Equities Favors J&S**

MMNA argues that J&S will not be harmed by an injunction because J&S is "primarily" a used car dealer and its Mitsubishi new car operations are unprofitable. As an initial matter, these arguments are irrelevant to the termination proceeding because MMNA is constrained to rely upon the grounds stated in the Notice of Termination to prove "good cause." *See N.J.S.A.* § 56:10-30(c). The Notice of Termination does not identify poor performance or insufficient new vehicle sales as grounds for termination, thus it cannot be considered as a basis for its decision to seek a

23

termination. Setting that aside, MMNA's argument seems to ignore the intangible, but very real, value of the Mitsubishi franchise, including the brand recognition, customer traffic, and legitimacy that an authorized new car franchise provides to the overall dealership operation. It also ignores the statutory protections that the New Jersey Legislature afforded to franchisees precisely because of the dramatic imbalance of power between franchisors and their dealers.

By contrast, MMNA's claimed "harm" from J&S's continued operation as a Mitsubishi dealer is speculative and overstated. If the Dealer Agreement was never lawfully terminated, then J&S's continued use of the Mitsubishi Marks is authorized, not infringing, and MMNA suffers no injury or harm. Moreover, during the pendency of this litigation, the consuming public is better served by an operational Mitsubishi dealership providing sales and service than by a gap in dealer coverage in the Ewing area.

**B.    The Automatic Stay Under N.J.S.A. § 56:10-30(a) Supports J&S's Position**

Pursuant to *N.J.S.A.* § 56:10-30(a), "[u]pon timely institution of an action . . . to enjoin the termination of a motor vehicle franchise . . . the termination shall be automatically stayed pending the final disposition of such action or proceeding." MMNA argues that J&S's filing on March 31, 2026 was untimely because it came after the March 18, 2026, effective date of termination.

However, J&S's failure to file a timely protest was directly caused by MMNA's own contradictory conduct, specifically, the issuance of the January 21, 2026 Notice of Material Breach, which led J&S to reasonably believe that the termination had been superseded or supplanted by the subsequent notice and the six-month cure period set forth therein. Where a franchisor's own misleading conduct causes a franchisee's failure to meet a procedural deadline, equitable principles should excuse that failure. MMNA should not be permitted to benefit from confusion that its own contradictory behavior created. *See Knorr v. Smeal*, 178 N.J. 169 at 178 (2003) (explaining that the doctrine of equitable estoppel "is designed to prevent injustice by not

24

permitting a party to repudiate a course of action on which another party has relied to his detriment.")

## C.        The Public Interest Favors J&S

The public interest strongly favors preserving established franchise relationships that serve local communities, consistent with the legislative policy underlying the FPA. The New Jersey Legislature enacted the FPA in recognition of the "dramatic economic imbalance between franchisors and franchisees," warranting statutory protections to prevent arbitrary or unfair terminations. *N.J.S.A.* § 56:10-7.2. That policy is directly implicated here, where a longstanding local dealer faces termination based on a defective notice and unsupported grounds.

Beyond the statutory framework, the public interest also favors the continued operation of local businesses like J&S, which contribute to the economic vitality of their communities by providing jobs, maintaining customer relationships, and delivering quality services. J&S serves as an authorized Mitsubishi dealership for consumers in Ewing, New Jersey, offering warranty repairs, recall services, and ongoing customer support that cannot easily be replicated or replaced. Disrupting that presence would not only harm J&S, but would also create a gap in service for the public. Maintaining J&S's operations during the pendency of this litigation ensures continuity, stability, and fairness.

## CONCLUSION

For the foregoing reasons, J&S respectfully requests that this Court enter an Order:

(1) Denying MMNA's motion for a temporary restraining order and preliminary injunction;

(2) Granting J&S's cross-motion for a preliminary injunction ordering MMNA to reinstate J&S as an authorized Mitsubishi dealer and to accord J&S all rights and privileges of a franchisee pending final disposition of this action;

(3) Declaring that the January 14, 2026 Notice of Termination is void and unenforceable for failure to comply with *N.J.S.A.* § 56:10-5 and ordering MMNA to either withdraw or re-issue the Notice of Termination;

25

185652864.3

(4) Enjoining MMNA from establishing a replacement dealer at or near J&S's business location at 1721 N. Olden Ave., Ewing, New Jersey during the pendency of this litigation; and

(5) Granting such other and further relief as the Court deems just and proper.


**FOX ROTHSCHILD LLP**
*Attorneys for Plaintiff/Counterclaim Defendant, Saliba Investment, LLC d/b/a J&S Mitsubishi*


By:  /s/ *Timothy J. Broking*
　　　　 Timothy J. Broking, Esq.


Dated: May 21, 2026

26

185652864.3